(No. 13062.—Judgment affirmed.)

ALVIN T. BRANT, Admr. Defendant in Error, *vs.* THE CHICAGO AND ALTON RAILROAD COMPANY, Plaintiff in Error.

*Opinion filed October 23, 1920—Rehearing denied Dec. 8, 1920.*

1. APPEALS AND ERRORS—*when Appellate Court may permit belated petition for rehearing to be filed—effect as to petition for certiorari.* If a motion to file a petition for rehearing is made in the Appellate Court during the term at which the opinion was filed, even though the time allowed under the rules has expired, the Appellate Court may act upon the motion at the next term, and if it denies the motion it may again reconsider it at the same term and permit the petition to be filed; and in such case the time for filing a petition for *certiorari* will be computed from the date the petition for rehearing is denied.

2. PRACTICE—*Federal right or defense must be asserted in State court according to State rules of practice and pleading.* A substantive Federal right or defense duly asserted cannot be lessened or destroyed by a State rule of practice, but such a right or defense must be asserted at a time and in such manner in the State court as will entitle the defendant to a consideration of the right or defense by the State court under its established system of practice and pleading.

3. SAME—*when a special finding of fact is binding on review.* Where no motion is made in the trial court to set aside special findings by the jury and no question as to them is raised in the motion for a new trial, the question is not saved for review by motion for a directed verdict nor by a general objection that the verdict is contrary to the weight of the evidence but such findings of fact are conclusively binding on the review.

4. RAILROADS—*the defendant must prove its defense of assumed risk.* In an action under the Federal Employers Liability act the burden of proof is on the defendant to establish its defense of assumed risk.

5. SAME—*what does not establish defense of assumed risk.* Under the Federal Employers Liability act an employee is not required to exercise care to discover danger which results from the employer's negligence, and where a brakeman is knocked off a moving train by a bridge because of defective "tell-tales," the railroad company cannot escape liability on the ground of assumed risk where it is not shown that the employee was aware of the defects in the tell-tales though he knew of the existence of the bridge.

6. SAME—*contributory negligence is not a defense under Federal Employers Liability act.*   Contributory negligence is not a defense under the Federal Employers Liability act but only goes in mitigation of damages, and the finding of the jury and the judgment of the Appellate Court are conclusive of such question if there is evidence to sustain the verdict.

7. SAME—*an agreement to assume risk of conditions of his employment is not binding on employee—instruction.*   An agreement in an application for work to assume the risk of the conditions of the employment is not binding on the employee as a waiver of conditions due to the employer's negligence, and in an action under the Federal Employers Liability act it is proper to so instruct the jury.

8. SAME—*what is proper instruction as to credibility of witnesses.*   In an action for damages it is not error to instruct the jury that if they are satisfied, from all the facts and circumstances proved, that a witness is mistaken in the things testified to by him they may disregard his testimony, and if they are satisfied, from all the facts and circumstances proved, that for any reason his testimony is untrue or unreliable they are not bound to take it as absolutely true.

9. SAME—*counsel should object to harmful argument to preserve question for review.*   Counsel desiring, on appeal or writ of error, to preserve objection to the argument of opposing counsel should object to the argument at the time it is made, so as to give the court opportunity to stop the argument and remove all hurtful effects possible by sustaining objection to the same and by proper reprimand to counsel and instructions to the jury.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Pike county; the Hon. HARRY HIGBEE, Judge, presiding.

BRACKEN & YOUNG, and WILLIAM & BARRY MUMFORD, (SILAS H. STRAWN, of counsel,) for plaintiff in error.

BEN H. MATTHEWS, for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Defendant in error, Alvin T. Brant, administrator of the estate of Mayo Earl Sutton, deceased, recovered a judgment in the circuit court of Pike county for $8500 against

plaintiff in error, the Chicago and Alton Railroad Company, for the death and conscious pain and suffering of the deceased, who was killed while in the employ of plaintiff in error. The judgment was affirmed in the Appellate Court and this court granted a writ of *certiorari,* and the record is brought to this court for review on a writ of error.

At the time of the injury to the deceased, August 29, 1916, and prior thereto, plaintiff in error maintained at Roodhouse, Illinois, a depot and seven railroad tracks, numbered from 1 to 7, which run east and west. North of the tracks plaintiff in error maintains an ice house 460 feet long, 64 feet wide and 28 feet from the ground to the eaves. Extending a distance of seven feet and six inches from the south side of the ice house there is a platform. Immediately south of the platform track No. 7 is laid, and immediately south of that track there is another platform called the icing platform, which is about 12 feet wide and about 16 feet from the ground. Track No. 6 lies just south of the icing platform. There is a bridge or cross-over above track No. 7 connecting the platform south of the ice house with the icing platform. The under part of the bridge structure is about 15 feet and 10 inches above the top of the rails of the track. This bridge is used for the purpose of taking ice from the ice house to the icing platform, to be placed in the top of refrigerator cars in trains standing on either track No. 6 or No. 7. The clearance between the underside of the bridge and the top of the refrigerator cars is approximately three feet. Sixty-three feet west of the bridge across track No. 7 is a "tell-tale," consisting of numerous strands of rope suspended from a wire netting, the lower ends of the ropes being three and a half or four feet above the top of ordinary Swift refrigerator cars. There is another similar tell-tale 300 feet west of the bridge over track No. 7. Tell-tale No. 1, farthest from the bridge, is supported by a pole, while tell-tale No. 2, nearest to the bridge, is fastened to the south side of the ice

house. Both tell-tales are constructed of two-by-six horizontal beams about 20 feet in length, from which are suspended frames of one-inch wrought iron, which are filled in with wire netting, and suspended to the underside of the frames are strands of rope, intended to give warning to employees on top of cars in moving trains of the near presence of the dangerous overhead bridge. A number of 100-watt electric lights are placed singly along the south side of the icing platform and at various other points south of track No. 7, and west of the bridge the same kind of lights are placed in clusters of four, all for the purpose of illuminating the ice house and the surroundings for the employees. A cluster of four lights is placed near the first tell-tale, and a single light is stationed a small distance on either side of the tell-tale nearest the bridge. Smoke and cinders from passing trains affect the illumination of these lights, decreasing their illumination sometimes as much as twenty-five per cent. The lights are cleaned regularly twice a year and had been cleaned about forty days prior to the injury to Sutton. Tracks Nos. 6 and 7 are used by trains having meat cars or other cars in them that require icing as they pass Roodhouse, and the cars are "spotted" at the proper places at the icing platform by signals given by employees at the ice house to employees on the approaching train. These two tracks leave the main track of the railroad near the same point in the western part of the yards and west of the first tell-tale and then run past the ice house and in the main parallel and close to each other.

Deceased became a student brakeman of plaintiff in error on July 7, 1916, and continued as such until July 14, when he became an extra brakeman. On July 24, 1916, after signing his application he was on the roll of plaintiff in error's employees as a regular brakeman. At about four o'clock on the morning of the accident the deceased was on a heavy meat train of plaintiff in error of thirty cars, on which he started his run from Booth, Missouri.

294—39

As the train of cars was entering the west end of the yards at Roodhouse the yardmaster told the engineer they were to go in on track No. 7. The train was running up-grade about five miles an hour as it moved over track No. 7 and the fireman threw in fresh coal, causing the locomotive to throw out large volumes of smoke when approaching the west end of the ice house. Another long train had pulled in on track No. 6, leaving barely room to pass it at its westerly end, and it was making a great deal of noise while the train on track No. 7 was approaching the ice house. At a point west of the first tell-tale the deceased climbed out of the engine cab onto the coal in the tender, and in that position, standing erect, he would have been eight inches lower than if standing erect on the top of the refrigerator car. He was first seen by a witness in this case west of the first tell-tale while thus riding on the coal in the tender. He was next seen when he was between the two tell-tales, standing on the running-board on top of and near the west end of the refrigerator car next to the engine, facing the rear of the train, with his back toward the tell-tale and the bridge. This car was to be iced at the east end of the icing platform. He was later seen on top of the same car a short distance west of the bridge and while passing through the tell-tale nearest the bridge and facing west. As the car went under the bridge it struck him about the hips, knocked him to the ground between and under the cars, and when he was taken out both legs were cut off and both arms were crushed and dangling. He was conscious and asked for chloroform, giving expressions of pain and suffering. He told those about him to send for a doctor and to tell him to hurry, and told them to tell his mother and wife good-by. He died about 5:40 o'clock the same morning he was injured, being conscious all that time and suffering great pain.

This action is based on the Federal Liability act. As originally drawn the declaration contained eight counts. The first, second and sixth counts were dismissed by de-

fendant in error at the trial. The remaining five counts, on which the case was tried, although differing in phraseology, charged that the plaintiff in error, as a common carrier, owed a duty to give warning to its brakemen and employees of their close proximity to the bridge already described, by means of whipping-straps or tell-tales or some other suitable device; that in attempting to comply with that duty plaintiff in error constructed and maintained the two tell-tales as aforesaid but carelessly and negligently permitted them to become broken and out of repair, so that they failed to give the deceased notice and warning of his approach to the bridge, etc. The five counts were substantially the same, except that the seventh and eighth claimed damages for conscious pain and suffering in addition to the damages claimed in the other counts. Plaintiff in error filed a plea of not guilty and two special pleas. The first special plea \ averred that the deceased knew of the dangers incident to passing under the bridge and assumed the risks connected with the employment and was guilty of contributory negligence in going on top of the car while passing under the bridge. The second special plea averred that the condition of the tell-tales was an ordinary hazard or risk of his employment, and that he had assumed the risk of the tell-tales getting out of repair.

With the case was taken a motion of defendant in error to dismiss this writ of error on the ground that this court has no jurisdiction. The showing offered by defendant in error on this motion is, that on December 14, 1918, a motion was made by plaintiff in error in the Appellate Court for leave to file a petition for rehearing after the expiration of the time for filing such petition; that on April 2, 1919, plaintiff in error's motion was denied by the Appellate Court after it had convened for its April term on April 1; that on April 9 plaintiff in error moved the Appellate Court to set aside its order of April 2 and for leave to file its petition for rehearing under its motion of December 14,

1918, and that on the same day the Appellate Court denied this second motion; that on April 22 the third motion of plaintiff in error was that the court set aside its former orders denying plaintiff in error leave to file the petition for rehearing and to allow its first motion to file such petition, and that on April 22 the last motion was allowed and the petition for rehearing filed and the rehearing denied. The opinion of the Appellate Court was filed in this case October 22, 1918, at its October term. The Appellate Court did not adjourn until the following January, 1919. The motion for leave to file a petition for rehearing was therefore filed in term time at the October term, 1918, of the Appellate Court, and the motion went over until the April term before it was disposed of. The Appellate Court undoubtedly had possession of the record of this case and jurisdiction of the cause at all times that the foregoing orders were rendered. It must be so presumed in the absence of any showing to the contrary, and there is no such showing. The motion for leave to file the petition for rehearing was in term time of the term at which the opinion of the court was filed, and although it was filed after the time for filing petitions for rehearing, the Appellate Court for good reason and on a proper showing might have granted leave to file a petition for rehearing at its October term. It had the power to even set aside any order or judgment rendered at that term before the final adjournment of the term, and, the motion having gone over to the April term following, it had jurisdiction to pass on the several motions at that term. This record does not disclose what showing was made by plaintiff in error in any of the above motions already recited, and this court cannot say that the Appellate Court did not have good cause for making its last order granting leave to file a petition for rehearing. It had jurisdiction to enter that order and also the order denying the petition for rehearing, and therefore the time for filing a petition for *certiorari* in this court is to be reckoned from

the time of the order denying the petition for rehearing. This court has jurisdiction of the case.

The first ground argued by plaintiff in error for reversal of the judgment is that the deceased was not in a position on the train on which he was riding to come in physical contact with the whips or strands of the tell-tale farthest west of the bridge at the time he passed under it on the day he was injured, and that for that reason it was immaterial whether or not that tell-tale was defective, and that the court erred in admitting evidence of the defective condition of that tell-tale. The evidence in the record does not support this contention. The witnesses Harry Kelley and J. E. Cardwell, and perhaps another witness, established the undisputed facts that when Sutton passed under the west tell-tale he was standing on top of the coal in the center of the tender just in the rear of the locomotive, and that this tender or the top of the coal was only about eight inches lower than the refrigerator cars in that train, which would make the top of the coal on the tender about four and a half feet below the whips of that tell-tale as Sutton passed under it if the whips had been in place. Sutton was proven to be five feet seven and one-half inches in height. His head and shoulders would necessarily have come in contact with the strands or whips of the tell-tale if they were all there and in good condition. The positive evidence in the record is that there was an opening about the middle of the west tell-tale near three feet in width by reason of the fact that a number of the strands or whips were broken, and that this opening was so large that the deceased could have received no warning by coming in contact with the whips or straps of the tell-tale.

The main contention of plaintiff in error is that the undisputed evidence in the record shows that the deceased did, in fact, come in contact with the strands of the tell-tale nearest the bridge and directly above the running-board of the first refrigerator car in the train, on which he was

standing as he passed under that tell-tale. It is then argued by plaintiff in error that its negligence, if any, because of the missing strands in the tell-tale nearest the bridge could not be the proximate cause of the injury, as the deceased was warned by the tell-tale just before being knocked off the car by the bridge. An examination of the evidence in the record reveals that the facts contended for by plaintiff in error are not undisputed but are closely contested by the witnesses. It is admitted by plaintiff in error that there were strands missing from this tell-tale, leaving a space of about sixteen inches or more in the tell-tale without strands, but it contends that the missing strands or this open space was south of the running-board on top of the refrigerator car, or to the right of the point where the deceased was standing as he passed under the tell-tale. A number of witnesses in the case testified that they examined the tell-tale nearest the bridge about two hours after the accident and saw an open space of about two feet caused by the missing strands and that the open space seemed to be in the center of the tell-tale. Some of them admitted that it might have been a little to the right of the center of the tell-tale. Still other witnesses testified that the open space was to the right or south of the running-board. It was abundantly shown that the body of the deceased in all probability had passed through the open space without being touched by the ropes. One of the plaintiff in error's witnesses testified that he was standing on the icing platform just south and west of this tell-tale, and that the deceased was facing him and facing in almost a westerly direction, and that he gave the deceased a signal that the first refrigerator car, on which the deceased was riding, was to be spotted at the east end of the icing platform; that this signal was given to the deceased just at the moment he was passing through or under the whip-straps of this tell-tale; that witness saw him through the whip-straps just after he passed through them; that he saw the whip-straps tremble or shake just after the

deceased passed through them, and that he then immediately turned his back to the deceased and walked away from him.

The jury were requested by plaintiff in error to make a special finding upon the above question as well as upon other questions involved, and two questions of fact were found with reference to this tell-tale. These questions are:

4. "Was the tell-tale over track No. 7 nearest the bridge sufficiently lighted as the train upon which Sutton was riding approached and passed beneath it to have been easily and plainly seen by him from the top of the car upon which he was riding?"

5. "Were the strands of rope in the tell-tale nearest the bridge missing from that portion of the tell-tale immediately above the running-board of the car upon which Sutton was riding at the time he collided with the bridge?"

The jury answered the fourth interrogatory "No" and the fifth "Yes." No motion was made by plaintiff in error in the trial court to set aside the special findings and no question as to them was raised in the motion for a new trial. It is strenuously urged, however, that the question is saved for review by the motion made by plaintiff in error for a directed verdict and by the general objection that the verdict is contrary to the weight of the evidence. These same contentions were made in *Brinnie* v. *Belden Manf. Co.* 287 Ill. 11, where this court held the opposite and announced the rule that the defendant was conclusively bound by the special findings of fact. That ruling is in accord with previous holdings of this court. (*Pennsylvania Coal Co.* v. *Kelly,* 156 Ill. 9.) The question of proximate cause was a question for the jury, and it is settled by the judgment of the Appellate Court so far as this court is concerned, as there is evidence in the record fairly tending to prove that issue. Upon that question we think the special finding of the jury, in substance, that the tell-tale nearest the bridge was defective in having a number of the strands missing just over the running-board on top of the car is

an ultimate and controlling fact in the case. The undisputed proof in the record is that Sutton was standing on the running-board on top of the car and looking a little southwesterly at an employee on the icing platform, from whom he got a signal and himself answered the signal. With proof that he was standing on the running-board and that there was a space or gap in the tell-tale just above his head sufficiently large for his body to pass through without being touched by any of the whips of the tell-tale, the conclusion necessarily follows that he received no warning from that tell-tale. Under the practice in this State plaintiff in error is bound by that finding, and we think that under the ruling of the Supreme Court of the United States in *Atlantic Coast Line Railroad Co.* v. *Mims,* 37 Sup. Ct. 188, it is also bound, under the rules of that court, by these special findings. That court recognizes the doctrine that a substantive Federal right or defense duly asserted cannot be lessened or destroyed by a State rule of practice, yet it holds that such a right or defense must be asserted at a time and in such manner in the State court as will entitle the defendant to a consideration of such right or defense by the State court under its established system of practice and pleading.

It is also contended that the deceased assumed the risks from which death resulted. Under the Federal Liability act assumed risk in this character of cases is a complete defense and the burden of proof on such an issue is on the defendant sued under the act. The burden of proof under its plea of assumed risk was on plaintiff in error in this case. Under the evidence in the record that question was one for the jury, and the court would not have been justified in taking it from the jury as there was evidence in the record fairly tending to prove that issue for defendant in error. (*Kanawha Railway Co.* v. *Kerst,* 239 U. S. 576.) There is no proof in the record that the deceased knew anything about the defective condition of the tell-

tales.  He had or was given information at the time of his employment as to the existence and positions of the tell-tales and well knew what the object and purpose of the tell-tales were.  The special object of constructing tell-tales is to give employees riding on trains warning of dangerous overhead structures, the whip-straps or strands touching them in the night time when they cannot see or in the day time when they are so busily engaged in their work that they fail to use proper diligence in looking out for such overhead structures.  When one is struck by these whip-straps at night or when engaged at work it is almost as much a warning of danger ahead as if another employee had placed his hand on him and told him to look out for the danger. In other words, it is the touch of the whip-straps, and not the sight of them, that the employee depends upon for his warning.

We are not impressed with the argument of plaintiff in error that as Sutton knew the tell-tales in question were in use for warning of the approach to the bridge he was charged with constructive notice of their defective condition.  This amounts to an assertion that it was his duty to exercise reasonable care to ascertain that the tell-tales were in good condition to warn him of the approach to the bridge in question.  An employee under the Federal Liability act is not obliged to exercise care to discover danger which results from the employer's negligence.  (*Gila Valley Railway Co.* v. *Hall*, 232 U. S. 101.)  Sutton had only been on the road a little over six weeks as an employee and student brakeman, and had been told by the trainmaster that the tell-tales had been placed as aforesaid for the protection of men in Sutton's line of employment, and he had a right to rely upon their being kept in good condition. The fact that there were two of these tell-tales, the farthest being 300 feet or more from the bridge, necessarily led Sutton to expect that he would receive two warnings before reaching the overhead bridge, and the defective condition of

the first tell-tale is clearly proven to have been such that it is morally certain he received no warning from it. The jury have, in substance, found that he did not receive such warning from the second tell-tale. The only plausible theory left for plaintiff in error to argue that Sutton assumed the risk is the showing in the record that if he had exercised ordinary diligence he might have seen the dangerous overhead bridge in time to have avoided it without the benefit of the warning from the tell-tales he had been informed he might expect while passing along track No. 7. While it is true that from the showing in this record Sutton did know of the existence of the dangerous overhead bridge and the danger to him by reason of its existence, and knew its location and the location of other objects along track No. 7, yet the tell-tales were the things he expected, and had a right to expect, would warn him in plenty of time of his near approach to the bridge so he could avoid it, without having to also locate the bridge by sight or by other objects near it and avoid it in that manner. We are clearly of the opinion that under the law we are bound by the finding of the jury that he did not assume the risk. Tell-tales that are so defective as not to give the warning intended are mere death traps to the employees they are to protect, and when an injury or death occurs by reason of defects caused by the negligence of the employer, the latter cannot escape liability on the ground, simply, that the employee knew of the existence of the bridge and its dangers. It must be further shown that he knew of the defective condition of the tell-tales and that he could not safely rely on them for protection. They were the real and only defective appliances complained of in plaintiff in error's structures, and it required knowledge of these defects and of the dangers therefrom to cast on Sutton the assumption of the risk. See the following cases: *West v. Chicago, Burlington and Quincy Railway Co.* 179 Fed. 801; *Harrison v. New York Central Railroad Co.* (N. Y.)

127 App. Div. 304; *Whitehead* v. *Wisconsin Central Railway Co.* 103 Minn. 13.

There is a conflict in the evidence upon the question whether or not Sutton's proper position on the train while it was traveling on track No. 7 was in the engine cab or on top of the train. Head brakemen are usually on top of the cars under such circumstances for the purpose of giving and receiving signals. There is evidence in the record to the effect that it was usual and customary for the head brakeman on this train to ride on top of the cars. There is also evidence in the record in behalf of plaintiff in error to the effect that Sutton had no duty on top of the train and that his proper place was in the engine cab, and that the movement of the train as it approached the ice house was governed by signals from the employees of the ice house to the engineer. Sutton actually did receive and answer a signal from an employee of the ice house just before he was struck by the bridge, and it is also shown that he had to have his back to the bridge while receiving and answering the signal. It is charged that he was guilty of contributory negligence in riding on top of the train, where he had no duty or right to be, and also because he was riding with his back to the bridge, which he knew must be near him. Be this as it may, contributory negligence is not a defense under the Federal Liability act but only goes in mitigation of damages, and we do not think the evidence in the record warrants us to further consider this question or to set aside the verdict and judgment upon the ground of contributory negligence. We regard the finding of the jury and the judgment of the Appellate Court as conclusive upon that question. *Spokane and Inland Empire Railroad Co.* v. *Campbell,* 241 U. S. 497; *Illinois Central Railway Co.* v. *Skaggs,* 240 id. 66.

No reversible error was committed by the trial court in giving defendant in error's third and seventh instructions, as contended by plaintiff in error. The third instruc-

tion in substance directed the jury that public policy does
not permit an employer, by contract or written application,
to relieve itself from liability for injuries occasioned by its
negligence or to impose upon its employees a risk that the
law imposes upon the employer. It further told the jury
that if it should appear from the written application of the
deceased that he agreed to assume the risk arising from the
existing conditions in the yards of the company such agree-
ment would not be binding upon him. It appears from the
evidence that Sutton did agree to assume the risk. It is
also the law that such a contract is not binding. Section 5
of the Federal Liability act provides: "Any contract, rule,
regulation or device whatsoever, the purpose or intent of
which shall be to enable any common carrier to exempt it-
self from any liability created by this act, shall to that ex-
tent be void." There was no impropriety in the giving of
the instruction, as it stated the law correctly.

The seventh instruction is in this language:

"You are the judges of the credibility of the witnesses
and of the weight to be attached to the testimony of each
and all of them, and you are not bound to take the testimony
of any witness as absolutely true, and you should not do
so if you are satisfied, from all the facts and circumstances
proved on the trial, that such witness is mistaken in the
matters testified to by him or that for any other reason his
testimony is untrue or unreliable."

This instruction, when properly read and understood,
states the law accurately and correctly, and is not objection-
able because it allows the jury to disregard the witness' tes-
timony for any reason they may conjure up, whether such
reason is supported by the evidence or otherwise. The last
clause of this instruction is modified by the preceding clause,
"if you are satisfied from all the facts and circumstances
proved on the trial." To get the correct meaning of the
latter part of this instruction it should be read as if writ-
ten thus: "If you are satisfied from all the facts and cir-

cumstances proved on the trial that such witness is mistaken in the matters testified to by him, or if you are satisfied from all the facts and circumstances proved on the trial that for any other reason his testimony is untrue or unreliable, you are not bound to take his testimony as absolutely true," etc. It is certainly the law that if the jury are satisfied, from all the facts and circumstances proved, that a witness is mistaken in the things testified to by him they may disregard his testimony, and it is also true that if the jury are satisfied, from all the facts and circumstances proved, that for any reason his testimony is untrue or unreliable they are not bound to take it as absolutely true. That is the sum and substance of what this instruction tells the jury. The same character of instruction was approved as correctly stating the law in *Taylor* v. *Felsing,* 164 Ill. 331, where it was also pointed out that the instruction was made objectionable by the presence therein of another clause, "or had knowingly testified falsely," which objectionable clause does not appear in the instruction now under consideration. The jury could not have interpreted the instruction as has plaintiff in error, we believe, and because of the further fact that the jury were abundantly instructed along the same line by other instructions which would lead them to interpret this instruction as we have.

It is finally complained that the judgment should be reversed because of improper argument to the jury by counsel for defendant in error. There was much unnecessary criticism of each other by counsel for the parties in this case in their arguments to the jury. This criticism was begun by counsel for plaintiff in error and without doubt moved counsel for defendant in error to answer in kind. We do not regard these mutual criticisms as cause for reversal of this judgment, although such criticisms are improper and out of place in the trial of a lawsuit. No objections were made to this character of argument by plaintiff in error, and we therefore pass over it. These and all

other remarks not objected to by plaintiff in error we will pass without further comment, not only because they were not objected to at the time they were made, but for the further reason that we do not regard them as reversible error. If counsel desire to preserve objections on appeal or writ of error to the Appellate Court or to this court, it is their duty under our practice to object to the argument at the time it·is made and give the court opportunity to stop the argument and remove all hurtful effects possible by sustaining objections to the same and by proper reprimand to counsel and instructions to the jury. Perhaps in a few cases remarks might be so vicious and so hurtful as to cause a reversal without objections being made or saved, but there are no such remarks in this record to which objections were not made by plaintiff in error. The only remarks of counsel for defendant in error in his argument to the jury of a serious character to which objections were made and saved are those with reference to the witness who claimed that he signaled the deceased and received a signal from him in return as he passed under the second telltale. This witness had testified that although he had seen Sutton pass beyond the second tell-tale towards the bridge, riding with his back to the bridge, he never warned him of his danger in any way but turned his back and walked away. The remarks of defendant in error's counsel were these: "I will give the man the benefit of the doubt. I would rather be accused, gentlemen of the jury, before a jury by an attorney of having told something upon the witness stand that was not true than to be accused of standing there and seeing a fellow go into the horrible death that boy went into that night and never raise my finger and never raise my voice to stop that awful tragedy. * * * That is the reason that I adopted the methods of cross-examination that I did of that man. * * * They ask you, based upon the testimony of Frank Sink, disregarding the testimony of all these other witnesses, they ask you to deprive that woman

that sits over there,—that nineteen-year-old widow,—and that little boy that is only three months old, out of their sustenance and support on the testimony of Frank Sink. Will a jury in Pike county,—will a jury of men that have got red blood in their veins,—stand for a proposition of that kind?" The court sustained an objection to this argument as an improper appeal to prejudice and sympathy and directed counsel not to pursue that line of argument any further. He also instructed the jury to disregard any such improper argument. Counsel who made the remarks immediately thereafter said to the jury: "I do not want you to place a verdict for me upon the ground of prejudice. * * * But I say this to you: I do not want you men to base a verdict against my client in this case upon the testimony of Frank Sink, because I do not think you are justified in doing it." The argument was unfair and improper, being an appeal to the jury calculated to enlist their sympathy for the widow. The court, however, did its duty in sustaining objections to these remarks and in properly instructing the jury with reference thereto, and we do not believe that this judgment ought to be reversed solely on account of this improper argument.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*